Filed 4/29/14  T.W. v. Superior Court CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| T.W.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Real Party in Interest. | A141031<br><br>(Contra Costa County<br>Super. Ct. No. J11-01449) |

T.W. filed this petition for extraordinary writ (Cal. Rules of Court, rule 8.452) to challenge the juvenile court's order setting a Welfare and Institutions Code section 366.26[1] hearing for her son, D. W.  She contends she was denied constitutionally required notice that the court could take this action because the Contra Costa County Children and Family Services Bureau (the Bureau) had recommended long term foster care as the permanent plan.  We will deny the petition and accompanying request for stay of the section 366.26 hearing.

**STATEMENT OF THE CASE AND FACTS**

D. was born in August 2009.  On October 18, 2011, the Bureau filed a juvenile dependency petition alleging that he was at risk due to abuse or neglect of his sibling.

---

[1] All Further undesignated statutory references are to the Welfare and Institutions Code.

1

(§ 300, subd. (j).) It was alleged that petitioner had placed the child at substantial risk of harm in that his sister had been punched and slapped by the father and petitioner had failed to prevent the continued abuse, and the father had placed the child at substantial risk of harm in that he had punched and slapped the sibling on several occasions.

The detention/jurisdiction report stated that D.'s 13-year-old sister had been physically abused in the parents' care, including being hit with belts, open hands and fists, and "punched on her hands, arms, body, and head (usually on the right side) up to seven times a week." It was reported that petitioner drinks "daily and heavily" and "usually gets violent when she drinks or takes her prescription pills." The parents had been making "threatening phone calls" to the sister, who had been living with a paternal uncle and his wife since August 2011, when petitioner was evicted from the family's home in Antioch. D. was reportedly living with the parents at petitioner's mother's home in San Francisco.

When the sister was detained, the parents denied domestic abuse or drug or alcohol abuse in the home. The father, however, had a long criminal history including multiple convictions for domestic violence and possession of controlled substances. According to the parents, the sister was lying about the alleged abuse and the aunt was encouraging her to do so in order to keep the sister with her. The father noted that the allegations were made the day after the parents told the aunt that they were moving back to Antioch and the sister could return home. The father also stated that petitioner took medication for back pain and a seizure disorder, both of which resulted from a car accident when she was a child.

D. was ordered detained after a hearing on October 19 but apparently then released to the parents, as an October 20 order indicates the minor was not detained. The jurisdiction hearing was held on several dates in November and December; on December 22, the parents pled no contest and the court sustained an allegation added to the petition that stated the child came within the provisions of section 300, subdivision (j), in that the father had used "inappropriate physical discipline" on the child's sibling and the mother "failed to intervene." The original allegations were dismissed.

2

On January 11, 2012, the Bureau requested a continuance of the disposition hearing scheduled for January 12 in order to allow more time to prepare its report. The Bureau anticipated requesting family reunification for the parents and sister and family maintenance for the parents and D. When the social worker had last seen D. on December 12, 2011, he had "appeared well cared for" but the social worker observed "severe repetitive rocking" that required assessment and rotting front teeth requiring dental care.

The disposition report prepared in February 2012 recommended reunification services for the parents and sister and family maintenance services for the parents and D. The parents' home was clean and orderly, they were cooperative with the Bureau and both "engage[d] in an appropriately playful way" with D. The social worker reported, however, that the parents had never acknowledged any problems that put their children at risk in any way, viewed the sister as a liar, and minimized D.'s possible developmental difficulties. The social worker did not believe the parents would follow through with medical care or a developmental assessment for D. without an explicit court order.

In an April 19 memorandum provided to update the court, the Bureau reported that D. had had a doctor's appointment and a follow up was scheduled, as well as a referral for dental services. The parents had not engaged in any of the services recommended for therapy and parent education. The social worker remained concerned about the parents not sharing her concern over D.'s language development and rocking behavior, noting that at 32 months of age, the child's vocabulary put him at the 18-month developmental range.

At the disposition hearing on April 26, D. was adjudged a dependent child, to remain in his parents' custody with a family maintenance plan.

In its report for the six-month status review, set for October 15, the Bureau recommended continuation of family maintenance services. The father had been incarcerated for a month on probation violations related to a 2010 arrest that included charges of contributing to the delinquency of a minor based on his having involved the sister in a shoplifting offense. The parents had followed through with dental care for D.

but not with individual therapy, parent education, drug testing or obtaining a developmental assessment for D. The Bureau was assessing whether it needed to file a subsequent petition to request detention to ensure the child's health needs would be met. On October 15, the six-month review hearing was continued to November 19 at the court's request.

On November 16, the Bureau filed a supplemental petition (§ 387) alleging that the parents had failed to engage in the family maintenance plan in that they were not complying with drug testing and had not engaged in parent education classes or therapy, that they had not followed through with needed dental surgery of the child and failed to show for a scheduled surgery, and that they had not followed through with the needed developmental assessment and arrived five hours late for a speech and language assessment. D. was detained at the November 19 detention hearing and subsequently placed in foster care.

The jurisdiction hearing, originally scheduled for November 29, was continued several times. In a December 6 memorandum, the Bureau advised the court that three of four letters the parents had provided to their attorneys and the court regarding their participation in services had not been prepared by the indicated providers. D. was doing well in foster placement. At a supervised visit with the parents, the social worker observed that the child was significantly more verbal than he had been over the preceding year. Since his dental surgery, in which three teeth were extracted and five capped, D. had stopped his rocking behavior.

On January 28, 2013, the court sustained the allegations of the supplemental petition. The court granted education rights to the foster parents, which the Bureau had requested because, after a speech assessment that recommended weekly speech therapy and more extensive testing, petitioner refused to sign the IEP to authorize speech services or additional testing.

In its report for the March 4 disposition hearing, the Bureau recommended family reunification services. The parents were not engaging in the reunification plan. The Bureau was concerned that the father had a serious anger management problem, referring

4

to his "recent antagonistic attack on the foster parent, along with the threatening text to the child's sibling," and that petitioner was "willing to collude with [the father] and lie about his behavior." D. was doing well in his foster home. The parents had supervised visits twice a month, which typically went well, but the parents tended to arrive at each visit very late and on one occasion when they arrived so late that the caregiver was about to leave, the father "used profanity and threats" toward the caregiver. The report stated that if the parents were not successful in completing reunification, the Bureau would seek a permanent plan involving adoption. At the hearing, the court continued the out of home placement and reunification services.

In August, in its report for the scheduled six-month status review hearing, the Bureau requested continued reunification services. D. had been moved to a new foster home due to his "increasingly difficult behavior" and was doing very well there. The parents had separated and neither had been engaged in reunification services; it appears that the father had no subsequent contact with the social worker or with D. Petitioner had last visited D. at the beginning of May; she was experiencing a psychiatric crisis and had been in and out of psychiatric hospitals since June.

The hearing was continued several times and in October the Bureau reported that D. had made tremendous emotional and developmental progress. Petitioner was living in an adult group home and receiving mental health treatment. She had not been "emotionally able" to visit D., but the social worker had talked to her and planned to try to schedule visits again. Although recommending that services be continued, the social worker stated there was little hope reunification would be possible given petitioner's lack of participation in services prior to her psychiatric problems. At the hearing on October 16, the court continued reunification services.

In its January 2014 report for the 12-month hearing, the Bureau recommended termination of reunification services and a permanent plan of long term foster care. D. was continuing to do extremely well in his foster home; he had made substantial developmental gains, was exhibiting "drastically fewer disturbing behaviors" and petitioner had continued to be in and out of psychiatric facilities and was currently living

5

at a treatment facility in San Francisco. Her current therapist opined that petitioner would not be able to care for her children " 'any time soon.'" Petitioner had visited with D. five times in the reporting period and the visits had gone well. The Bureau stated that it was attempting to find an adoptive home but was recommending a permanent plan of long term foster care because, in light of D.'s special needs, it did not want to terminate parental rights until an adoptive family was located.

On January 15, the matter was continued at petitioner's request for a contested hearing on February 10. Petitioner was not present at the February 10 hearing. Her attorney told the court there was a "noticing issue" because the Bureau had recommended long term foster care but the court had stated it was not willing to follow the recommendation and wanted to set a section 366.26 hearing. Counsel stated that petitioner had a right to receive notice of the change in recommendation; county counsel and the social worker indicated that the Bureau's recommendation had not changed. The court stated its inclination to set a section 366.26 hearing rather than follow the Bureau's recommendation, and asked petitioner's attorney if she had authority for her position that a continuance was required because the court had not given a tentative decision putting petitioner on notice as to how it might rule. Counsel did not have authority "off the top of [her] head" but believed notice was required. She submitted documents reflecting collection of samples for drug testing on four dates in December 2013 and January 2014, reports of negative drug test results for two dates in December 2013, and two unsigned letters from La Amistad treatment facility stating that petitioner had been residing and participating in treatment since December 5, 2013, and intended to remain for the entire 90-day program.

The court explained that after reading in the Bureau's report about D.'s "incredible changes" and "tremendous growth and improvement in his behavior," the court believed he was an adoptable child. Reminding the parties of the "fraud that was perpetrated by the parents on the Court with respect to claims of engagement and services when in fact they had none," the court expressed concern about an unsigned letter petitioner's attorney had provided to document petitioner's residence and participation in treatment at La

6

Amistad residential treatment facility and stated that even if participation could be confirmed, information in the status review report indicated petitioner's mental health condition was "not at all stabilized" and she continued to "fail to engage meaningfully in services to address the issues that brought this child before this court." The court stated it was "clear" that the parents remained "unsafe" and there would be a substantial risk if the child was returned, and that there was no evidence the parents would be able to reunify within the next six months. The court terminated reunification services and ordered the Bureau to prepare the assessment required by section 366.21 for the section 366.26 hearing.

Petitioner filed a notice of intent to file writ petition on February 13, 2014.

## DISCUSSION

Petitioner contends the juvenile court violated her due process right to notice and an opportunity to be heard by denying her request to continue the hearing and "unilaterally" ordering a section 366.26 hearing when the Bureau had recommended long term foster care.

" '[P]arents are entitled to due process notice of juvenile proceedings affecting their interest in custody of their children. [Citation.] And due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." [Citation.]' (*In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418.)" (*In re Anna M.* (1997) 54 Cal.App.4th 463, 468.) Petitioner urges that the juvenile court denied her notice "that termination of her parental rights would be the permanent plan the court would order."

Petitioner's characterization of the court as having decided to terminate her parental rights is inaccurate. The decision whether to terminate parental rights is made at the section 366.26 hearing. (§§ 366.21, subds. (f) and (g); 366.26.) What the court did in the present case was find that it was more likely than had previously appeared that D. could be adopted and, therefore, that a section 366.26 hearing should be held and an assessment be made of the factors relevant to determining whether he could be adopted

7

and whether petitioner's parental rights should be terminated.  This finding was more consistent with the Bureau's report than petitioner acknowledges.  Although the Bureau maintained its prior recommendation of long term foster care as the permanent plan, it expressly stated that it was doing so while also looking for an adoptive home for D., because D.'s special needs might complicate the adoption route.  Petitioner, therefore, did have notice that the Bureau was actively pursuing adoption as an option despite its formal recommendation.

Unlike the cases upon which petitioner relies, petitioner's parental rights have not been terminated without notice of the agency's recommendation to terminate (*In re Anna M., supra,* 54 Cal.App.4th at pp. 468-469) or without *any* notice of the hearing at which reunification services were terminated and a section 366.26 hearing set (*In re DeJohn B.* (2000) 84 Cal.App.4th 100, 107, 109-110).  Petitioner states that "no party" had notice that setting a section 366.26 hearing was "a possible judicial outcome."  Setting the hearing was clearly one of the options open to the court under section 366.21.  The juvenile court is not *required* to follow the Bureau's recommendation when the evidence supports a different outcome.  In essence, petitioner is arguing that due process requires a continuance whenever the court decides not to follow the Bureau's recommendation.  She provides no authority to support this position, and we are aware of none.

## DISPOSITION

The petition and request for stay are denied.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

8

_____
Kline, P.J.

We concur:

_____
Haerle, J.

_____
Richman, J.